UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUTH LAPPRICH,

                  Plaintiff,                      Case No. 2:15-cv-13290

                                                Judge Avern Cohn

v.                                        Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

                  Defendant.

_____/

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 16), GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 18) AND TAKE CORRECTIVE MEASURES

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 11), **GRANT** Defendant's motion for summary judgment (DE 13),

**AFFIRM** the Commissioner's decision and **TAKE** corrective measures, as

outlined below (*see* Section G).

**II.**    **REPORT**

        Plaintiff, Ruth Lapprich, brings this action under 42 U.S.C. § 405(g) for

review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance ("DI") benefits.

This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 16), the Commissioner's cross motion for summary judgment (DE 18), and the administrative record (DE 14).

### A.    Background

Plaintiff filed her application for DI benefits on October 30, 2012, alleging that she has been disabled since December 15, 2009, at age 51. (R. at 169-170, 188-189, 190-206.) Plaintiff alleges disability as a result of a left hip injury, fibromyalgia, depression, fatigue, cervical neck pain/injury, lymphedemia (lymphedema), migraines, hypoglycemia, thoracic back pain and kidney stones. (R. at 190-206.) Plaintiff's application was denied on January 10, 2013. (R. at 93-105, 106; *see also* R. at 113-122.)

Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ"). (R. at 123-124.) ALJ David A. Mason, Jr., held a hearing on January 13, 2014, at which Plaintiff was represented by counsel (Alice Blackmore) and Vocational Expert (VE) Cheryl Mosley testified. (R. at 43-92; *see also* R. at 110-111, 112, 159, 160.)[1] On May 23, 2014, ALJ Mason determined that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 20-42.)

---

[1] On April 5, 2013, Disability Examiner Jean Weathers rendered the Case Analysis on reconsideration. (*See* R. at 107-109.)

Plaintiff requested review of the hearing decision.  (R. at 15-16.)[2]  On July 22, 2015, the Appeals Council denied Plaintiff's request for review.  (R. at 1-6.)  Thus, ALJ Mason's decision became the Commissioner's final decision.

Plaintiff then timely commenced the instant action on September 17, 2015.  (DE 1.)

### B.    Plaintiff's Medical History

Plaintiff alleges in the field office disability report that she has been disabled since December 15, 2009.  (*See* R. at 188.)  Plaintiff's medical records span the period from April 14, 2003 through March 19, 2014.  (R. at 247-897 [Exhibits 1F-32F].)  Of particular importance are those records which are near to or follow her alleged date of onset.

### 1.    Physical Health

On December 15, 2009, Plaintiff was admitted to Saint Joseph Mercy Hospital, where she underwent a vaginal hysterectomy, as well as an anterior and posterior cystocele and rectocele repair, and placement of a Monarc sling.  (R. at 251, 385, 386, 465, 509, 524 & 543.)  She was discharged on December 17, 2009.  (R. at 385-387.)  On January 21, 2010, Martha H. Reincke, M.D., of Ann Arbor Neurology, who was seeing Plaintiff for neurologic follow-up, assessed Plaintiff

---

[2] Around this time, Plaintiff had a change of counsel.  (*See* R. at 14, 17, 18 & 19.)  On September 13, 2014, Plaintiff's request for more time before the SSA acted on her case was granted.  (R. at 7-8.)

with, among other things, (1) left hip pain; (2) migraine headaches *with aura*, since childhood; (3) fibromyalgia in the context of stress and depression; (4) history of left carpal tunnel syndrome, currently suggesting sensory loss in the left ulnar nerve distribution; and (5) cervical disc protrusion/spondylosis of C5-6 (without significant canal stenosis and with unremarkable examination showing no clinical findings), suggestive of cervical radiculopathy or myelopathy.  (R. at 367-369.) Plaintiff again treated with Dr. Reincke on August 23, 2010 and December 10, 2010 and March 7, 2011; in each case, Plaintiff was assessed with extremities pain / pain in limb, migraine *without aura* (not intractable) / migraine (common without intractable migraine), cervical spondylosis and numbness / disturbance of skin sensation.  (R. at 353, 358, 363-364 [Ex. 5F]; *see also* R. at 645 [Ex. 14F]).

During 2009, 2010 and 2011, Plaintiff underwent operative procedures at Michigan Pain Specialists.  Drs. Freydl and Bojrab performed cervical epidural steroid injections at C7/T1, a left trochanteric bursa injection, a left lateral femoral cutaneous nerve block, cervical interlaminar epidural steroid injections at C7/T1, a left hip large joint injection, and a left lateral femoral cutaneous nerve block.  (R. at 315-340 [Ex. 4F]; *see also* R. at 463-464, 699-700, 707-708.)  Meanwhile, Plaintiff treated with Cathy Christensen, NP-C, of Pain Recovery Solutions from January 18, 2011 through October 30, 2012.  Many of these records were also signed by Mark A. Weiner, M.D.  (*See* R. at 564-601 [Ex. 13F], 647-655 [Ex.

14F]).  Notes from several of these visits indicate that Plaintiff's pain is well controlled with various doses of Suboxone, although in at least one case Christensen noted that Plaintiff has occasional fibromyalgia flares, especially during weather changes.  (*See* R. at 566, 568, 571, 587, 649, 651, 654.)

Plaintiff also treated with Dean R. Schueller, M.D. of Ann Arbor Orthopaedic Surgery.  On January 6, 2011, she complained of left hip pain, and Dr. Schueller suspected fibromyalgia "with greater trochanter bursitis."  An x-ray of the pelvis / left hip showed no abnormalities.  He gave Plaintiff an injection, recommended stretching and massage, prescribed Naproxen and noted that, if pain persists, they could discuss possible bursectomy.  (R. at 438-440.)  Following a March 9, 2011 re-check of Plaintiff's left hip, Dr. Schuller's plan included yoga, pain management and follow up at Plaintiff's discretion for another injection.  (R. at 437.)  At a December 21, 2011 follow up visit, Dr. Schueller recommended more yoga, home exercise, visiting a pain specialist if her pain becomes severe, occasional injections every three or four months if needed, and the possibility of a bursectomy if her pain becomes intractable and is not resolved by other measures. (R. at 436.)  On December 20, 2012, Plaintiff saw Dr. Schueller for problems with her right knee and left hip, and he suspected chondromalacia patellae and trochanteric hip bursitis.  Plaintiff received an injection in her left hip, and Naproxen was prescribed.  (R. at 709-711.)  On January 23, 2013, Dr. Schueller

ordered physical therapy to evaluate and treat Plaintiff's left hip and right knee.
(R. at 717.)  Plaintiff participated in physical therapy at Michigan Rehabilitation
Specialists from February 4, 2013 through March 6, 2013 and was discharged on
March 14, 2013.  (R. at 712-716 [Ex. 19F], 718-729 [Ex. 20F].)[3]

Plaintiff had a physical therapy evaluation and treatment for pelvic floor
pain and dyspareunia at the University of Michigan Health System from February
19, 2013 through July 1, 2013.  (R. at 788-819.)  On August 20, 2013, she
underwent a previously recommended excision of her vaginal mesh at the
University of Michigan; however, she continued to have "baseline urgency
incontinence."  (R. at 730-733, 780-785, 819-825.)

In the meantime, Plaintiff again treated with Christensen and/or Weiner
during 2013.  (R. at 761-770 [Ex. 24F].)  For example, the March 19, 2013 notes
explain that she discontinued regular physical therapy, but continued with pelvic
floor therapy, as it "helps a lot and . . . the therapist has also been working on her
left hip, which has enabled her to discontinue the other PT."  (R. at 767.)  Also,
notes from Christensen and/or Weiner dated October 1, 2013 represent that
Plaintiff's pain is well controlled with buprenorphine and Motrin, although

---

[3] The February 4, 2013 notes indicate Plaintiff's pain was a 2 on a scale of 0-10,
and the March 14, 2013 notes indicate that Plaintiff called "to let us know that she
would like to discontinue physical therapy at this time due to her busy schedule."
(R. at 729, 722.)  However, during the January 13, 2014 hearing, Plaintiff
explained that she was seeing a pelvic floor therapist at the University of Michigan
who "was doing more for me than this lady was."  (R. at 64-65.)

2:15-cv-13290-AC-APP   Doc # 19   Filed 07/18/16   Pg 7 of 36   Pg ID 1001

Plaintiff was told to try taking a maximum of 1 Norco per day for breakthrough pain. (R. at 761-762 [Ex. 24F].) Unsigned January 2, 2014 assessments from Christensen / Weiner mention "[c]hronic pain with focus to the left hip, groin, and leg status post hysterectomy with co-occurring fibromyalgia." (R. at 871-872 [Ex. 29F].)[4]

### 2.    Mental Health

On August 4, 2009, Ross Halpern, Ph.D., L.P., performed an initial mental health evaluation. Dr. Halpern noted, among other things, that Plaintiff was mildly depressed and anxious due to her chronic pain, and was stressed because she had been off work since May 29. However, she was open to coping strategies. Dr. Halpern also noted that Plaintiff might have underlying dependency issues. (R. at 265-267.) Plaintiff treated with his practice on August 25, 2009 and then from January 12, 2011 through November 6, 2013. (R. at 826-865.)

On February 18, 2014, Plaintiff was examined by Thomas M. Horner, Ph.D., a licensed psychologist. Although he diagnosed depression in relation to multiple health and pain stressors, his medical source statement described her abilities as follows:

---

[4] Plaintiff treated with Deborah L. Peery, M.D., Plaintiff's primary care physician, during 2009, 2010, 2011, 2012 and 2013. (*See* R. at 270-295 [Ex. 3F], 431-433 [Ex. 7F], 629-640 [Ex. 14F], 748-754 [Ex. 23F]; *see also* R. at 267, 385). Plaintiff also treated with Dr. Goh of Huron Valley Urology Associates during those same years. *See* Exhibits 10F (R. at 470-519 [01/09/2009 – 02/23/2012]) and 16F (674-680 [4/18/2013]). These records are mentioned as necessary below.

2:15-cv-13290-AC-APP   Doc # 19   Filed 07/18/16   Pg 8 of 36   Pg ID 1002

Ms. Lapprich's ability to relate positively, reciprocally and effectively with others, including coworkers, customers/clients, and supervisors is intact. Ms. Lapprich's abilities to understand, remember and to carry out familiar or customary tasks are essentially intact. Her ability to focus and sustain attention to relevant and customary occupational tasks is similarly intact and operational except as affected by intrusive pain. Ms. Lapprich's ability to withstand or otherwise cope with the stresses of ordinary or customary occupational activity is adequate except as affected by the aforesaid physical conditions. Outside of the actual physical health conditions of which she complains, for which there is clinically observed and documented evidence, and which could well therefore interfere with an overall ability to undertake or to sustain physical work activity, Ms. Lapprich would be able and reasonably motivated to engage in work activity.

(R. at 876-881 [Ex. 30F].)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff was 55 years of age at the time of the hearing. (R. at 51; *see also* R. at 169.) Although she used to be "a full-time contributor to [her] household[,]" at the time of the hearing, she did not have a source of income and was living off of savings. (R. at 71, 80.)

Plaintiff has a driver's license and drives approximately once per week for distances less than 10 miles, although she has difficulty driving for more than 15 or 20 minutes. (R. at 54-55.) Plaintiff attends church or religious services approximately twice per month, just for the sermon, and she will occasionally have lunch with a friend. (R. at 55-56.) She does not engage in sports, but her hobbies include sewing, knitting and baking. (R. at 56; *see also* R. at 75.) She has a

8

computer at home and uses it for email, Facebook and a source of information. (R. at 57-58.) She does not read as much as she would like to, seemingly because she gets sleepy and dozes during the day due to not sleeping much at night. (R. at 75.) Plaintiff estimated that she gets a total of a couple of hours of sleep during the night. (R. at 77.) If she does not sleep through the night, she wakes up with swollen hands. (R. at 80.)

Her husband takes her to the gym. (R. at 54.) She attempts to go three times per week. She can only do approximately 15 minutes on the bike, as it usually causes "numbness in [her] pelvic floor area." However, if she does not engage in some type of physical activity, "the pain and the fibromyalgia stuff is worse." (R. at 65.) She will also "sit in a hot tub afterwards to kind of relax the muscles[,]" and occasionally she will use "the warm pool." (R. at 65-66.)

Plaintiff testified that she has problems with thought, memory, getting up and down, walking, standing, lifting, pushing and sitting. (R. at 52-53, 74-75.) For example, during a 2010 trip to Florida, she had to take lots of breaks at Disney World and left the park early, and she had a couple of "really bad spasms" during the plane ride. (R. at 57-58; *see also* R. at 63.) According to Plaintiff, if she is sitting too long, she will sometimes experience "weird spasms in [her] legs and sometimes arms, neck area." (R. at 58.) The muscle spasms seem to have increased in frequency in the past year and a half. (R. at 58-59.) Also, during the

9

hearing, the ALJ noted Plaintiff's apparent discomfort and informed her she could stand. (R. at 58; *see also* R. at 64, 71-72.)

Plaintiff agreed that she had previously been an "extremely active person[.]" (R. at 62.) However, she further testified that, following her December 15, 2009 hysterectomy and bladder surgery, she had "excruciating hip and leg pain." (R. at 61; *see also* R. at 51.) She experiences leg lymphedema. (R. at 80.) Her left hip pain ranges between 2 and 8, at the latter end of the range about two or three times per week. (R. at 66.) If she takes pain medication – presumably Norco - it will help curb the pain so that it lasts about an hour and a half. (R. at 66-67.) However, the side effects of Norco include increased constipation, an increased need to catheterize, and sleepiness. (R. at 67.)[5] She has episodes of urinary incontinence, about 3 to 4 times per day. (R. at 77-78.) She also has cervical neck pain, thoracic back pain and osteoarthritis in her right knee. (R. at 68.) According to Plaintiff, her knee pain can get up to a 4 or 5 on a scale of 10 but is usually between a 1 and 2. (R. at 69.) She further testified that she could not work one or two days per week, explaining that her body "doesn't tell [her] when it's going to have a good [day]." (R. at 70.) She experiences 3 or 4 migraine headaches per month and takes

---

[5] Elsewhere, she testified that the side effects of her medications include sleeplessness, insomnia, and constipation (which affects her bladder and may result in needing to catheterize, a process which takes about five minutes). (R. at 59-60.)

Maxalt, which causes her to be "a little tired . . . ."  (R. at 75-76; *see also* R. at 78-79.)

Plaintiff also testified that she is "up and down all night long," but usually rises around 6:00 a.m. or 7:00 a.m.  (R. at 71.)  She can dress and bathe herself and does some cooking.  She grocery shops with her husband, who drives her, carries the bags and loads and unloads the cart.  She also washes some dishes and does laundry.  (R. at 69.)  Her husband takes the laundry downstairs to the washer and dryer, unloads the basket, divides the clothes for her, and carries it back upstairs; she does a lot of the folding.  (R. at 76-77.)  She will follow him downstairs on a good day, but she has trouble with stairs.  (R. at 77.)  She does her housework around her good and bad days.  (R. at 70; *see also* R. at 71.)  On a good day, she can probably walk a city block and stand for 40 minutes.  She can reasonably sit for 30 minutes.  (R. at 72-73.)  Lifting much more than a gallon of milk causes carpal tunnel pain.  She drops things and has weakness in her hands.  (R. at 73.)  She had carpal tunnel surgery in both hands during 1986 and 1987.  (R. at 73-74.)

## 2.   **Vocational Expert Testimony**[6]

VE Mosley testified about transferability of skills, the exertional levels of Plaintiff's past work as an office manager and medical assistant, and vocational adjustment.  (R. at 81-84.)  The VE further testified that a hypothetical individual

---

[6] The VE's curriculum vitae and work summary form are part of the administrative record.  (*See also* R. at 167-168, 236, 237.)

with Plaintiff's age, education and prior work experience, who is limited to light work with certain exertional limitations (20 pounds occasionally, 10 pounds frequently; stand or walk for 6 of 8 hours; sit for 6 of 8 hours; occasional left foot controls or foot lower extremity tasks), postural limitations (occasional ramps and stairs; no ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl), manipulative limitations (bilaterally no more than frequent fingering, feeling) and environmental limitations (avoid concentrated exposure to noise, needing basically an office environment; avoid concentrated exposure to vibration; avoid concentrated exposure to hazards, that is dangerous moving machinery, unprotected heights; no exposure to unprotected dangerous settings; no rough, uneven, slippery, or shifting, obstructed terrain; and no hand powered tools) would be able to perform Plaintiff's past work as a medical assistant, which the VE classified at the light exertional level.  (R. at 85-86; *see also* R. at 83, 91.)  The VE further testified that such an individual would be able to perform work as a receptionist, which he classified as sedentary.  (R. at 87-88; *see also* R. at 82, 91.)

The VE believed that two five-minute bathroom breaks would not be work preclusive.  However, the VE also believed three additional bathroom breaks of five minutes during the course of the day would preclude employment.  (R. at 88.) The addition of a sit/stand option would render the person unable to perform the medical assistant position; however, such a person could perform the office

12

manager position as defined in the DOT and the receptionist position.  (R. at 88-89.)  Consistently needing to lie down and rest for at least 45 minutes per day, exclusive of breaks and a meal period, would preclude the receptionist and office manager jobs.  (R. at 89-90.)  While being off-task 8 or 15 percent of the day would not be work preclusive, being off-task 20 percent would be work preclusive.  (R. at 89-91.)  Finally, missing more than 2 days of work per month, consistently, would be work preclusive.  (R. at 90.)

### D.   The Administrative Decision[7]

ALJ Mason rendered his decision on May 23, 2014.  (R. at 20-42.)  At Step 1, he found that Plaintiff has not engaged in substantial gainful activity during the

---

[7] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

period from her alleged onset date of December 15, 2009 through her date last insured of March 31, 2014.  (R. at 25.)

At Step 2, the ALJ found that Plaintiff has the following severe impairments: fibromyalgia, status-post bilateral carpal tunnel release, migraine headaches, status-post gastric bypass, chronic pain, osteoarthrosis, incontinence, bladder dysfunction, bursitis, uterine prolapse status-post hysterectomy, status-post removal of vaginal mesh, and degenerative disc disease of the cervical and lumbar spine.  (R. at 25-27.)

At Step 3, the ALJ found that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (R. at 27.)

At Step 4, the ALJ found that Plaintiff has the RFC to perform light work with certain *exertional limitations* (she can occasionally use left foot controls or perform left lower extremity foot tasks; she can sit for 1 hour at a time, but after 30 minutes of sitting she would need to move around for 2 to 3 minutes while still remaining on-task to some aspect of the position; and she can stand or walk for up to 2 hours at a time for a total of 6 out of 8 hours), *postural limitations* (she can occasionally climb ramps or stairs, but she cannot climb ladders, ropes or scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl), *manipulative limitations* (she is limited to no more than frequent fingering or

feeling bilaterally), and *environmental limitations* (she should avoid concentrated exposure to noise so she basically requires an office environment; she should avoid concentrated exposure to vibration and hazards such as dangerous moving machinery and unprotected heights; she should have no exposure to unprotected dangerous settings, hand power tools, and rough, uneven, slippery, or shifting obstructed terrain).  In addition, the ALJ determined that Plaintiff would require 2 additional 5-minute bathroom breaks.  (R. at 27-35.)  Moreover, the ALJ found that, through the date last insured, Plaintiff was capable of performing her past relevant work as an office manager, as it did not require the performance of work-related activities precluded by her RFC.  (R. at 35.)

Alternatively, at Step 5, having considered Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff had also acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy.  (R. at 35-36.)

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

16

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F.     Analysis

Plaintiff argues that the ALJ's decision is not supported by substantial evidence, because the ALJ did not properly evaluate (a) her severe impairment of fibromyalgia, (b) her severe impairment of chronic pain, or (c) her depression and anxiety.  (DE 16 at 4-5, 11-13, 13-16.)

The Commissioner contends that substantial evidence supports the ALJ's RFC finding, because the ALJ (a) "thoroughly evaluated" Plaintiff's fibromyalgia and (b) "made a clear and detailed RFC finding as to the functional limitations Plaintiff suffers from her medically determinable impairments . . .[,]" namely chronic pain, depression and anxiety.  (DE 18 at 3, 8-20, 20-25.)

### 1.     Plaintiff's counsel's brief does not aid his client's cause.

At the outset, I note that Plaintiff's motion for summary judgment does not seem to contain express citation to any one of her approximately 650-pages of medical records, which she, herself, describes as "vast."  (R. at 247-897, DE 16 at 14.)  *See also Marion v. Astrue*, No. 3:10-CV-00258, 2010 WL 4955714, at *4

(N.D. Ohio Nov. 30, 2010) ("While Marion's *pro se* allegations are to be liberally construed, it is not the Court's function to comb through hundreds of pages of medical records to craft an argument that might resemble one Marion attempts to raise.").  In fact, the argument portion's only express references to pages of the administrative record are citations to the ALJ's hearing decision (R. at 25-27) or to Plaintiff's hearing testimony (R. at 47, 48).  (*See* DE 16 at 11-16.)  This is surprising, given that, in a challenge to any of the first four steps, "the claimant has the burden of proof[.]"  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

It is also surprising in light of this Court's past admonitions to Plaintiff's counsel.  For example, after commenting on "a disturbing trend in the submissions of Plaintiff's counsel[,]" this Court warned that:

> Such hyperbole and generalized accusations of ALJ misfeasance are no substitute for engagement with the actual evidence in the administrative record and the explanations and analysis actually put forward by the ALJ. Counsel ill serves his clients by charging the ALJs with wholesale dereliction of their duties, rather than identifying specific findings by the ALJs that might lack evidentiary support or rest upon legally deficient reasoning. Accordingly, counsel is placed on notice that this Court will carefully examine his submissions in future suits to ensure that they advance specific, narrowly tailored, and properly supported arguments that rest upon (and cite to) the facts of a particular case. Failure to adhere to these standards will result in the imposition of sanctions and possible referral of counsel for disciplinary proceedings.

*Roberts v. Comm'r of Soc. Sec.*, No. 14-11994-GER-APP, 2015 WL 5439725, at

*2 (E.D. Mich. Sept. 15, 2015) (Rosen, C.J.).  *See also Spiteri v. Colvin*, No. CV

14-14140-LJM-EAS, 2015 WL 7258749, at *3 (E.D. Mich. Nov. 9, 2015), *report*

*and recommendation adopted sub nom. Spiteri v. Comm'r of Soc. Sec.*, No. 14-CV-

14140, 2015 WL 8538036 (E.D. Mich. Dec. 11, 2015) ("Spiteri's almost complete

lack of argument development renders the majority of his arguments waived.");

*Harper v. Comm'r of Soc. Sec.*, No. 2:14-CV-11630-LJM-EAS, 2015 WL

4509076, at *4 (E.D. Mich. July 24, 2015) (Michelson, J., adopting report and

recommendation of Stafford, M.J.) (remanding but recognizing that "[t]he majority

of Harper's arguments are cursory and underdeveloped.").

Relatedly, Plaintiff's motion contains the inaccurate accusation that "[t]he

ALJ never even mentions let alone evaluates the regulations."  (DE 16 at 13.)  ***This***

***is simply incorrect.***  For example, at the beginning of the Step 4 RFC

determination, the ALJ states that his consideration was guided by, among other

regulations, SSR 96-7p.  (R. at 27.)  In addition, the decision contains multiple

references to the SSRs.  (*See* R. at 24, 27, 35 & 36.)  Moreover, there are multiple

citations to the Code of Federal Regulations (CFR).  (*See* R. at 23-27, 35-36.)

Plaintiff's counsel is cautioned that the use of emphatic but inaccurate

statements—such as his repeated use of words and phrases like "never," "makes no

attempt," and "did not" (DE 16 at 14, 15, & 16)—to describe the ALJ's analysis

19

seriously detracts from the credibility of his arguments and does not exhibit the candor toward the tribunal expected by this Court.[8]

Accordingly, this report and recommendation will only address the issues presented, as framed by Plaintiff, and will not expend further effort evaluating issues that Plaintiff tangentially mentions. (*See* DE 16 at 4-5, 11 & 13; E.D. Mich. LR 7.1(d)(2) ("Form of Required Briefs.").)  The latter would include, as the Commissioner argues, any claims that "are so undeveloped as to be waived."  (DE 18 at 20-21.)  For example, to the extent, if at all, Plaintiff's assertions that "[f]ibromyalgia was never considered under the listed impairments . . ." and/or "[t]he case ought to be remanded for a proper evaluation of the severe impairment of fibromyalgia at steps three through five[,]" were attempts to bring an independent Step 3 Listings argument or an independent Step 5 argument, such attempts are undeveloped and waived.  (DE 16 at 13; *see also* DE 18 at 19.)

> **2.      The ALJ adequately evaluated Plaintiff's severe impairment of fibromyalgia as required by SSR 12-2p and 20 C.F.R. §§ 404.1527(c), 416.927(c) ("Evaluating opinion evidence.").**

Plaintiff contends that, after the ALJ found fibromyalgia to be a severe impairment at Step 2, "the ALJ never again evaluates or determines what limitations Plaintiff has as a result of the fibromyalgia.  There is never another mention of fibromyalgia in the decision."  (DE 16 at 11.)  Plaintiff further asserts

---

[8] *See also*, Michigan Rule of Professional Conduct 3.3.

that "ALJ Mason never evaluates the Plaintiff's severe impairment of fibromyalgia[,]" and, yet, "points to no medical records for his assertions." (DE 16 at 14; *see also* DE 16 at 12.) Even ignoring the seeming contradiction between accusing the ALJ of failing to evaluate a condition, while in the very next sentence accusing him of failing to support "his assertions" – presumably those regarding that same condition (whatever those may be, as Plaintiff does not tell us), ***all of this is simply untrue.*** In fact, the ALJ expressly mentions fibromyalgia at multiple points during his Step 4 RFC determination, including:

- Dr. Reincke's January 21, 2010 notes that Plaintiff has a history of fibromyalgia (R. at 367 [Ex. 5F])

- Dr. Freydl's August 26, 2010 statement that "[i]t is conceivable if she did not have fibromyalgia that this pain would not be significant enough for her to even mention." (R. at 307 [Ex. 4F])

- Dr. Weiner's August 14, 2012 notes that Plaintiff "reports that her pain is well controlled on this dosage [Suboxone 2 mg tablets totaling 2 mg daily] with the exception of occasional fibromyalgia flares, especially during changes in the weather." (R. 566 [Ex. 13F], 649 [Ex. 14F])[9]

- Erin Crosby, M.D.'s September 26, 2013 notes that Plaintiff complained of "discomfort with prolonged sitting but [wa]s unsure if that is from the sling or the fibromyalgia." (R. at 824 [Ex. 26F])

---

[9] The ALJ's May 23, 2014 decision refers to Dr. Weiner. (*See* R. at 26, 30-33.) However, many of these records are signed by and/or list the name of Christensen and/or Dr. Weiner. (*See* R. at 564-601 [Ex. 13F], 647-655 [Ex. 14F], 761-770 [Ex. 24F] and 871-872 [Ex. 29F]).

- Christensen / Dr. Weiner's January 2, 2014 assessment of chronic pain with focus to the left hip, groin, and leg status post hysterectomy with co-occurring fibromyalgia (R. at 872 [Ex. 29F])

(R. at 29, 31 & 32.)  Thus, even if the ALJ's decision does not expressly mention SSR 12-2p, it is not true that ALJ Mason "never evaluates Plaintiff's fibromyalgia. . . and simply ignores the medical evidence."  (DE 16 at 12.)  It is quite clear from these references to the medical record that the ALJ did indeed consider fibromyalgia in his evaluation.

Based upon Plaintiff's reference to 20 C.F.R. § 404.1527 (*see also* 20 C.F.R. § 416.927) and his allegation that the ALJ did not properly assess "the evaluation of Plaintiff's treating physician evidence that claimant suffers from fibromyalgia and has severe limitations as a result of fibromyalgia[,]" (*see* DE 16 at 7, 11-12), it seems that this argument would have been more properly framed as one challenging the ALJ's assignment of weight to the various medical opinions.  Any such argument is undeveloped.  For example, the ALJ assigned "some significant weight" to the state agency medical consultant's (R. H. Digby, M.D. M.P.H.'s) January 9, 2013 physical RFC assessment (R. at 101-104), "significant weight" to the January 10, 2013 assessment of the state agency psychological consultant (Rom Kriauciunas, Ph.D.) (R. at 99-100), "significant weight" to the August 4, 2009 initial evaluation by Ross Halpern, Ph.D., L.P. (R. at 265-267), "significant weight" to the February 18, 2014 assessment of Thomas M. Horner, Ph.D. (R. at

22

875-881) and "some significant weight" and "little weight" to the February 22, 2014 assessment of Brian Hinkley, D.O. (R. at 883-895),  (*See* R. at 33-34.)  At the same time, the ALJ assigned "limited weight" to Dr. Goh's October 22, 2009 notes and "little weight" to Dr. Goh's June 30, 2010 letter (R. at 476, 503-504).  (R. at 34.)  If Plaintiff intended to challenge the ALJ's assignment of weight to the opinion evidence, it is not clear to this Court which particular assignment of weight Plaintiff contests, much less why.  Accordingly, the Court cannot address an argument that the ALJ's assignment of weight to the opinion evidence contravened 20 C.F.R. §§ 404.1527(c), 416.927(c).  More to the point, Plaintiff has the burden of proof to establish her severe impairments at Step 2, and her skeletal analysis does not meet that burden here.  *See* Walters, 127 F.3d at 529.

      **3.**      **The ALJ adequately evaluated Plaintiff's severe impairment of chronic pain as required by SSR 96-7p ("Assessing the credibility of an individual's statements") and 20 C.F.R. §§ 404.1529, 416.929 ("How we evaluate symptoms, including pain.").**

As noted above, at Step 2 the ALJ found "chronic pain" to be among Plaintiff's severe impairments.  (R. at 25.)  Without citation to any of Plaintiff's medical records, Plaintiff asserts, "[i]it is undisputed by every doctor that has actually examined the Plaintiff that she would have functional limitations with walking and standing from her multiple back and pain issues and yet the ALJ found the Plaintiff can sustain a competitive work schedule at the light exertional

23

level." (DE 16 at 14.) Thus, the Court is left to guess which doctors those might be.

Then, Plaintiff claims that her chronic pain is "never mentioned or evaluated" by the ALJ in his decision. (*See* DE 16 at 14-15.) ***This is inaccurate***. In at least ***three areas***, the ALJ expressly discusses "chronic pain." For example, within his Step 2 determination, the ALJ expressly acknowledged Dr. Halpern's August 4, 2009 diagnosis that Plaintiff was "mildly depressed and anxious due to *chronic pain*." (R. at 25, 267 (emphasis added).) Then, in his Step 4 RFC determination, the ALJ expressly cited the January 2, 2014 notes of the nurse practitioner and/or Dr. Weiner which reflected *"[c]hronic pain* with focus to the left hip, groin, and leg status post hysterectomy *with co-occurring fibromyalgia*." (R. at 32, 872 (emphases added).) Finally, the ALJ stated: "[t]he undersigned likewise gives *significant weight* to Dr. Halpern's initial assessment that the claimant was mildly depressed and anxious due to *chronic pain* because this opinion is consistent with the evidence of record as a whole . . . ." (R. at 34, 267 (emphases added).)

Moreover, Plaintiff's arguments that the ALJ "never evaluates" and "makes no attempt" to assess Plaintiff's subjective complaints in accordance with SSR 96-7p ***are inaccurate***. (DE 16 at 15-16.) Her assertion that the ALJ "never gives any reasoning throughout his decision" with respect to this issue ***is likewise inaccurate***.

24

(DE 16 at 16.)  SSR 96-7p provides that the ALJ "must consider in addition to the

objective medical evidence when assessing the credibility of an individual's

statements:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the
      individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any
      medication the individual takes or has taken to alleviate pain or
      other symptoms;

5.    Treatment, other than medication, the individual receives or has
      received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has
      used to relieve pain or other symptoms (e.g., lying flat on his or
      her back, standing for 15 to 20 minutes every hour, or sleeping
      on a board); and

7.    Any other factors concerning the individual's functional
      limitations and restrictions due to pain or other symptoms.

SSR 96-7P (S.S.A. July 2, 1996).  ALJ Mason's decision addressed several of

these factors:

•    Considering Plaintiff's testimony, the ALJ concluded at Step 2
     that Plaintiff had mild limitation in "activities of daily living,"
     and, in the Step 4 RFC determination, the ALJ assigned
     significant weight to state agency psychological consultant
     Rom Kriauciunas, Ph.D.'s conclusion that Plaintiff had mild
     restriction of activities of daily living.  (R. at 26, 33-34, 100.)

- Plaintiff testified that her medication side effects include sleeplessness, insomnia, constipation and effects on her bladder and sleepiness, some of which were expressly noted in the ALJ's Step 4 RFC discussion. (R. at 59-60, 67; *see also* R. at 28.)

- At Step 2, the ALJ noted that "the claimant's narcotic pain medication is prescribed by Mark Weiner, M.D., and his treatment records document a denial of cognitive functioning *side effects* as well as a lack of evidence of depression since she established care with him in January 2011 (13F, 14F, 24F, 29F)." (R. at 26 (emphasis added).)[10]

- The ALJ also made note of **(a)** narcotic pain medications prescribed after her December 15, 2009 surgery, presumably Percocet prescribed on December 22, 2009 (R. at 28, 480); **(b)** Dr. Reincke's notes that Plaintiff's migraine headaches are manageable with medication (Maxalt) (R. at 29, 353 [8/23/2010]); **(c)** treatment with Suboxone by Christensen, NP-C / Dr. Weiner of Pain Recovery Solutions (R. at 30, 564-601 [Ex. 13F]); **(d)** Dr. Goh's apparent advice that Plaintiff's bladder problems "were most likely due to her medication and she should continue to self-catheterize, which she generally did once a day[,]" (R. at 30, Ex. 10F, 13F),[11] and **(e)** the October 1, 2013 direction to try her leftover narcotic pain medication (Norco) for breakthrough pain (R. at 32, 762).

---

[10] These four exhibits total more than 100 pages of records. It would have been helpful to the Court if the citations had been more specific.

[11] In support of this statement, the ALJ cites both records from Huron Valley Urology Associates (R. at 470-519 [Ex. 10F]) and records from Pain Recovery Solutions (R. at 563-611 [Ex. 13F]). The ALJ does not specify to which page of these records he refers; however, the Court suspects it may be Dr. Goh's notes dated June 29, 2009 (R. at 511-512), the May 12, 2011 notes of Christensen / Weiner (R. at 589) and/or what seems to be the October 12, 2011 notes of Weiner / Christensen (R. at 578).

- Within the Step 4 RFC determination, the ALJ pointed to Christensen / Weiner's January 2, 2014 notes (R. at 871-874 [Ex. 29F]) when stating "Issues were noted with constipation and abdominal pain, but she denied other *side effects* from medication and has been able to continue her exercise regimen of 3 days per week at the gym[.]" (R. at 32 (emphasis added).)

(*See* R. at 26-32.)

Presumably referring to the ALJ's statement that Plaintiff's statements concerning the intensity, persistence and limiting effects of symptoms "are not entirely credible for the reasons explained in this decision[,]" (R. at 32), Plaintiff alleges that the ALJ completely failed to evaluate Plaintiff's pain and fatigue "except to summarily dismiss them in a single conclusory statement." (DE 16 at 13.)[12] ***This is also inaccurate.*** In fact, the ALJ followed his review of the medical record with express discussion of Plaintiff's credibility. To begin, *the ALJ found Plaintiff credible on certain matters*, which resulted in "an option to allow her to move around every 30 minutes[,]" and an accommodation "allowing her extra bathroom breaks to self-catheterize twice a day." (R. at 32.)[13] He also found her

---

[12] It is true that ***fatigue*** was a basis on which Plaintiff sought disability. (R. at 191.) However, even if the ALJ's opinion does not expressly address "fatigue," notes from August 23, 2010, March 7, 2011, April 20, 2010 and September 15, 2010 indicate "negative for fatigue." (*See* R. at 352, 362, 528, 530.)

[13] The ALJ reached this determination, notwithstanding his earlier reference to apparent advice that Plaintiff should continue to self-catheterize, "which she generally did once a day[.]" (R. at 30, citing Exs. 10F & 13F.) Elsewhere there are references in the medical record to self-catheterizing once weekly (R. at 600 [Ex. 13F]) and a few times per month (R. at 681, 684 [Ex. 17F].)

established medically determinable impairments and the accompanying objective findings supportive of the exertional, postural, manipulative, and environmental limitations set forth in the RFC assessment.  (Id.)

In addition, *the ALJ explained those areas in which he did not find Plaintiff fully credible*.  First, the ALJ found it inconsistent that Plaintiff received unemployment benefits during the third and fourth quarters of 2011 and the first quarter of 2012 (R. at 185 [Ex. 8D], 187 [Ex. 10D]) – periods of time which post-date her alleged December 15, 2009 onset of disability, yet testified on January 13, 2014 that she was essentially unable to work part-time (R. at 70).  (*See* R. at 33.)

Second, the ALJ noted that the objective medical evidence of record did not support a finding that Plaintiff's conditions were totally disabling.  In doing so, the ALJ pointed to a plethora of evidence:

> X-ray studies of her hips and knees have been completely unremarkable (8F [R. at 440], 9F [R. at 457][14]).  An MRI study of her cervical spine showed some mild abnormalities, but Dr. Reineke characterized it as perfectly normal (4F [R. at 313, 341]).[15]  An MRI study of her thoracic spine and a whole body bone scan showed no abnormalities (6F [R. at 416, 417]).[16]  An x-ray study of her left foot showed only mild abnormalities and electrodiagnostic testing did not reveal any motor or neuropathic evidence

---

[14] To be sure, the right knee view showed "[v]ery minimal medial joint line osteophyte formation, but otherwise the knee is unremarkable."  (R. at 457.)

[15] The Court suspects Dr. Reineke's reference may have been to the thoracic spine MRI and not the cervical spine MRI.  (*See also* R. at 414.)

[16] (*See also* R. at 299-300, 450-451.)

(14F,[17] 15F [R. at 664-665]).  An updated bone densitometry study was obtained in October 2013 to evaluate complaints of increased thoracic pain, which was normal [(R. at 758 [Ex. 23F])], and the March 2014 lumbar spine MRI study did not reveal any discrete etiology to explain her left-sided leg symptoms (22F [R. at 736-741], 32F [R. at 896-897]).

(R. at 33.)

Third, the ALJ noted "significant inconsistencies" in Plaintiff's subjective allegations, such as:

For example, she testified that she self-catheterizes 1 to 3 times per day [R. at 60], but the highest level of frequency documented in her treatment reports was once a day in the summer of 2011, but this was only necessary 1 to 2 times per week in early 2013 (13F [R. at 578, 589, 600], l7F [R. at 681, 684], 25F [R. at 774]). Even after the recent vaginal mesh excision, the claimant was not overly concerned about receiving treatment for her incontinence issues (26F [R. at 825[18]]). As another example, she told Michigan Rehabilitation Specialists that her schedule was too busy to continue physical therapy, but she told Dr. Weiner that pelvic floor physical therapy was helping a lot and enabled her to discontinue the other physical therapy (20F [R. at 722], 24F [R. at 767]).

(R. at 33.)

Thus, Plaintiff's statements that "[t]he ALJ makes no attempt to evaluate the factors set forth in SSR 96-7p in his decision[,]" or "[n]ot one factor under SR 96-7p is discussed by ALJ Mason[,]" (*see* DE 16 at 16) are simply wrong.  *See also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

---

[17] The Court was unable to locate the x-ray study of Plaintiff's left foot within Ex. 14F (R. at 612-660) or Ex. 15F (R. at 661-673).

[18] Physical therapy notes dated September 26, 2013 indicate among other things that Plaintiff "left before treatment for urinary incontinence could be discussed." (R. at 824-825.)

### 4.   The ALJ adequately evaluated Plaintiff's depression and anxiety.

Plaintiff contends that the ALJ's failure to include depression and anxiety as Step 2 severe impairments was in error and further argues that these impairments were not addressed in the remaining steps of the 5-step sequential process.  (DE 16 at 14-15.)  ***This argument ignores the record.***  (*See, e.g.,* R. at 33 and 34.)  Moreover, her assertion that, "[t]he ALJ clearly had a predetermined RFC before the Plaintiff ever had a hearing as he even acknowledged in the hearing[,]" (DE 16 at 14 (citing R. at 47-48)) is ***unwarranted and frivolous***.[19]

First, the ALJ made several references to Plaintiff's depression and/or anxiety.  For example, at Step 2, the ALJ determined that Plaintiff's medically determinable mental impairment of depression did not result in more than minimal limitation in her ability to perform basic mental work activities and was, therefore, non-severe.  (R. at 25.)  Then, within the Step 2 discussion, the ALJ cited to: Plaintiff's hearing testimony (*see* R. at 49-80), as well as the August 4, 2009 evaluation by Ross Halpern, Ph.D., which concluded that Plaintiff "is *mildly depressed* and anxious due to chronic pain[,]" (R. at 265-267 [Ex. 2F] (emphasis added)); the August 25, 2009 through November 6, 2013 treatment records of Ross

---

[19] Instead, at the outset of the hearing, the ALJ acknowledged having read the file beforehand and explained that he had some concerns about certain matters, such as "instances where physical therapy is discontinued because it says claimant's too busy[,]" in an effort to "tip [his] hand" as to those areas which should be addressed.  (R. at 47-48.)

Halpern and Associates (R. at 826-865 [Ex. 27F]); the February 18, 2014

consultative examination of Thomas Horner Ph.D., who diagnosed depression "in

relation to multiple health and pain stressors," but opined that Plaintiff's "abilities

to understand, remember and to carry out familiar or customary tasks are

essentially intact[,]" (R. at 875-881 [Ex. 30F]); and the January 18, 2011 through

January 2, 2014 office treatment records of Pain Recovery Solutions (R. at 564-

601 [Ex. 13F], 647-655 [Ex. 14F], 761-770 [Ex. 24F], 871-872 [Ex. 29F]).  (R. at

25-26.)

        Also, within the Step 4 RFC determination, the ALJ mentioned:  **(a)** state

agency consultant Rom Kriauciunas, Ph.D.'s January 10, 2013 assessment of

Plaintiff's medically determinable impairments ("MDI"), wherein his

consideration of affective disorders (Listing 12.04) resulted in conclusions that

there were no "repeated episodes of decompensation, each of extended duration,"

and there were mild restrictions or difficulties in "activities of daily living,"

"maintaining social functioning," and "maintaining concentration, persistence or

pace."  (R. at 100 [Ex. 1A]);[20] **(b)** Dr. Halpern's August 4, 2009 conclusion that

---

[20] The ALJ's opinion actually states that the state agency psychological consultant
"assessed the claimant's depression as *non-severe* because it did not cause any
repeated episodes of decompensation . . . ."  (R. at 33 (emphasis added).)  Lest
there be any confusion, "[d]epression is a mental disorder found in the Affective
Disorders section of the Listing of Impairments at 12.04."  *Buxton v. Halter*, 246
F.3d 762, 764 (6th Cir. 2001) (referencing 20 C.F.R. Pt. 404, Subpt. P, App. 1
(12.04)).

Plaintiff is "mildly depressed and anxious due to chronic pain[,]" (R. at 265-267 [Ex. 2F]); and **(c)** clinical psychologist Dr. Horner's February 18, 2014 medical source statement indicating that Plaintiff's ability to do work-related activities was not affected by her mental impairment – presumably the diagnosis of depression (in relation to multiple health and pain stressors) (R. at 879-881; *see also* R. at 876-878 [Ex. 30F]). The ALJ assigned each of these opinions significant weight, each on the basis that it was "consistent with the evidence of record as a whole." (R. at 33-34.)

Second, to the extent Plaintiff argues that the ALJ's Step 2 reliance on "one page of the vast medical records" - Dr. Horner's February 18, 2014 opinion - in support of the conclusion that Plaintiff's "ability to understand, remember, and carry out instructions . . ." (R. at 26, 878), does not constitute "substantial evidence," (*see* DE 16 at 14), there remain the numerous other references described above. In a challenge to any of the first four steps, "the claimant has the burden of proof[.]" *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). Plaintiff has not convinced the Court that her depression and anxiety were improperly considered by the ALJ.

### G.    Conclusion, Concerns and Corrective Measures

In sum, I conclude that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY**

Plaintiff's motion for summary judgment (DE 11), **GRANT** Defendant's motion for summary judgment (DE 13), and **AFFIRM** the Commissioner of Social Security's decision.

As discussed earlier in this report, Plaintiff's brief has serious shortcomings. It demonstrates, through a series of inaccuracies which I have endeavored to point out, that Plaintiff's counsel either intended to deceive this Court or failed to actually read the ALJ's opinion before resorting to unacceptable, hyperbolic attacks on the ALJ's analysis. Either behavior flouts counsel's obligations under Fed. R. Civ. P. 11(b) ("Representations to the Court."), wastes this Court's time, and, as noted above, does not aid the client's cause.

These ill-advised "techniques" employed by Plaintiff's counsel have also been pointed out by other judicial officers in this District. *See Roberts,* 2015 WL 5439725, at *2, *Rhodes v. Colvin*, No. CV 14-13716-AC-EAS, 2015 WL 6509151, at *3 (E.D. Mich. Oct. 7, 2015) (Stafford, M.J.) (observing that the ALJ had been seriously misrepresented), *report and recommendation adopted sub nom. Rhodes v. Comm'r of Soc. Sec*., No. 14-13716, 2015 WL 6796594 (E.D. Mich. Nov. 6, 2015); and *Davis v. Commissioner of Soc. Sec.,* No. 15-13028-NGE-PTM(E.D. Mich. June 15, 2016) (Morris, M.J.) ("Plaintiff raises a number of underdeveloped arguments and generalized accusations of ALJ misfeasance with little citation to case law or the administrative record."), *report and recommendation adopted*,

(E.D. Mich. July 12, 2016) (Edmunds, J.).  Counsel Joshua L. Moore has been

repeatedly cautioned that these practices would not be tolerated in this Court,

including a warning from then Chief Judge Rosen in *Roberts*, *supra.*, that future

behavior of this kind "will result in the imposition of sanctions and possible

referral of counsel for disciplinary proceedings;" a warning from Magistrate Judge

Stafford in *Spiteri*, *2015 WL 7258749, at \*3 n.3;* and an admonition from

Magistrate Judge Morris in *Davis* that, "[T]his is the third warning that attorney

Joshua L. Moore has been given, and [the Court] encourages him, yet again, to

take heed of this warning."  *Davis*, Case No. 15-13028 (E.D. Mich. June 15,

2016).[21]  In light of what has yet again occurred in the case at bar, it is therefore

recommended that the Court directly sanction counsel and/or that counsel be

referred for disciplinary proceedings, as previously contemplated.

## III.   PROCEDURE ON OBJECTIONS

        The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

---

[21] *See also Gower v. Comm'r of Soc. Sec.*, No. 13-14511-AJT-PTM, 2015 WL 163830, at \*8 (E.D. Mich. Jan. 13, 2015) ("Rather than heed this warning and identify supporting evidence, Plaintiff has merely reiterated her claim that such evidence has been overlooked.") (Tarnow, J., *adopting report and recommendation of* Morris, M.J.).

of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: July 18, 2016                    s/Anthony P. Patti
                                        Anthony P. Patti
                                        UNITED STATES MAGISTRATE JUDGE

35

I hereby certify that a copy of the foregoing document was sent to parties of record on July 18, 2016, electronically and/or by U.S. Mail.

s/Michael Williams
Case Manager for the
Honorable Anthony P. Patti
